UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CIOX HEALTH, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 1:18-cv-0040-APM |
| | ) |
| ALEX M. AZAR II, Secretary of Health and Human Services, et al., | ) |
| | ) |
| Defendants. | ) |

**DECLARATION OF TARUN KABARIA**

I, Tarun Kabaria, declare under penalty of perjury that the following facts are true and correct to the best of my knowledge, information, and belief:

1. I currently serve as the Executive Vice President of Operations for CIOX Health, LLC ("CIOX"). Prior to my position as Executive Vice President of Operations, I served as a Senior Vice President of Operations for CIOX.

2. Based on the many roles and responsibilities I have held at CIOX, I am personally familiar with: the state and federal laws, regulations, and rules with which CIOX must comply for the release of medical records; with the contractual terms that govern CIOX's relationships with the healthcare providers that have engaged CIOX to conduct ROI services on their behalf (so-called "covered entities"); with CIOX's processes for processing requests for, and releasing, medical records in

31568399 v1

accordance with the foregoing legal and contractual restrictions; with the costs associated with providing ROI services to CIOX's covered-entity clients; and with the fees and revenues CIOX generates by providing the aforementioned ROI services. Accordingly, I have personal knowledge of all matters discussed herein, and if required, would testify to the following facts:

### THE NATURE OF CIOX'S BUSINESS

3. CIOX is a leading provider of ROI services (known as a "business associate") and a trusted partner to healthcare providers. CIOX currently serves approximately 13,000 covered-entity clients throughout the United States, and those clients reflect the full diversity of America's healthcare industry—from large hospital chains and healthcare plans, to small non-profit medical clinics and even individual healthcare practices.

4. Among many other capabilities and responsibilities, the ROI services CIOX provides to its covered-entity clients consist of performing the work necessary to review, verify, and process requests for the disclosure of individually-identifiable health information (also known as "protected health information" or "PHI") in response to valid requests for the production of such information. On an annual basis, CIOX currently processes tens of millions of individual requests for PHI and produces literally billions of pages of PHI in response to such requests.

5. Responding to such requests requires CIOX to perform an array of specific tasks, including locating, retrieving, sorting, analyzing, extracting, compiling, duplicating, storing, and delivering PHI in response to a valid request. This work is extraordinarily challenging and time-consuming. Most requests for PHI require

CIOX to collect relevant information from multiple sources that exist in multiple formats across multiple locations.  For example, many of the records gathered by CIOX for release are not available in electronic or digital form at all.  Portions of a given patient's records pre-dating the use of electronic health records often either exist only on paper, microfilm, or radiological films.  And for those historical medical records that have been newly digitized, as well as newer medical records that were created, gathered, and maintained in electronic format from the outset, relevant PHI often resides in different systems or sources, implemented in different jurisdictions, over different periods of time, by different companies.  Many of these systems therefore do not properly interact with each other—they are not "interoperable."  It therefore takes a considerable amount of time to search for and locate all relevant PHI that may be responsive to a given request.  And once such information is located, it takes substantial technical skill to retrieve, sort, analyze, extract, compile, and then prepare relevant PHI for release.

6. That process is further complicated by the various federal and state statutes, regulations, and rules that govern the release of such highly-sensitive information, which together have the effect of requiring CIOX's employees to inspect each and every page of each and every record in preparing the records for release. This page-by-page inspection ensures that all of the PHI on each page to be released is within the parameters of what was requested and that its release would not violate any applicable regulations and statutes.  If the pages contain information outside the parameters of the request—or information not permitted for release—CIOX

3

employees must redact it. CIOX employees thus receive extensive, specialized training to perform these tasks and ensure that a given release is fully compliant with all applicable laws and regulations.

## CIOX'S CONTRACTS WITH PROVIDERS

7. Given CIOX's role as a business associate providing ROI services to covered entities, the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Pub. L. No. 104-191, 110 Stat. 1936 (codified in various portions of the United States Code), as amended by the HITECH Act (Title XIII of the American Recovery and Reinvestment Act of 2009, Pub. L. No. 5, § 111, 123 Stat. 115), and as implemented by the Department of Health and Human Services ("HHS") in a series of regulations known collectively as the "Privacy Rule," requires CIOX to operate only pursuant to a formal contract—commonly called a "business associate agreement" or "BAA"—with each of its covered-entity clients. Absent such a contract, CIOX cannot lawfully be granted access the PHI contained within the covered entity's records, and therefore could not lawfully perform the ROI services outlined above.

8. Among other things, CIOX's BAAs expressly require CIOX to process lawful requests for PHI on behalf of the covered entity and further obligate CIOX to comply with each of the covered entity's legal obligations to produce requested PHI to patients and certain third parties in accordance with (and only in accordance with) the many restrictions of HIPAA, HITECH, and the Privacy Rule—including certain fee restrictions (known as the "Patient Rate") that apply to both covered entities and business associates like CIOX when fulfilling certain medical-record requests. For

4

instance, a typical, representative, and current BAA between CIOX and a major medical facility chain provides that CIOX "shall not Use or Disclose PHI in a manner that would violate the terms of this Addendum or HIPAA, if such Use or Disclosure would constitute a violation of HIPAA if done by Covered Entity, it being the intent of the Parties that the requirements of HIPAA that are applicable with respect to Covered Entity shall also be applicable to Business Associate in all respects and shall be incorporated by reference into this Addendum."

9. HIPAA, HITECH, and the Privacy Rule also deem CIOX's covered-entity clients directly liable in the event that CIOX violates the restrictions of HIPAA, HITECH, and the Privacy Rule in the course of carrying out the above-described ROI services on behalf of the covered entity.  For that reason, CIOX's BAAs also generally require it to indemnify the covered entity for any violation of HIPAA, HITECH, or the Privacy Rule that CIOX might commit when providing ROI services, including violations of the Patient Rate if that rate applies to a given request.  For instance, a typical, representative, and current contract between CIOX and a major medical facility chain provides that CIOX "agrees that all fees and charges related thereto charged by [CIOX] in connection with the fulfillment of health information requests shall be in compliance with all federal, state, and local laws, rules and regulations applicable thereto; [CIOX] shall indemnify, defend and hold harmless Participating Facility against any claim of noncompliance with such laws, rules and regulations."

10. Like most contracts, CIOX's contracts with its covered-entity clients also govern the compensation that CIOX may receive for fulfilling PHI requests on behalf

5

of the covered entity. Though the specific language of CIOX's agreements varies from contract to contract, the compensation model is generally consistent: Rather than collect a service fee from the covered entity in exchange for fulfilling PHI requests from an individual, an individual's personal representative, or an authorized third-party entity, CIOX's compensation for providing those services under the vast majority of its 13,000 client contracts consists solely of the fees it receives from the requestor or third-party recipient of requested PHI.

## HHS'S ACTIONS ARE HARMING CIOX

11. Before 2009, requests for PHI by commercial third parties almost exclusively were made directly by the third party and were accompanied by a so-called "patient authorization" that allowed for the release of the authorizing individual's PHI to that third party. Because the Patient Rate did not apply to such patient-authorized requests (and still does not apply) to such patient-authorized requests, CIOX typically charged state-authorized or independently-contracted rates for fulfilling such "authorized" third-party requests. Those fees varied (and vary) significantly from case-to-case depending on the relevant state laws and the complexity and scope of a given request, but for requests seeking "any and all" PHI about an individual—which commonly were (and are) made by life insurance companies seeking to underwrite a new policy, or lawyers requesting a patient's medical records for use in connection with litigation—it was (and is) not uncommon for CIOX to charge several hundred dollars per request or, in particularly complex cases involving decades of patient records and thousands of pages of responsive PHI,

6

more than one thousand dollars, in full accordance with the various state statutes and regulations governing such charges.

12.     In 2009, the HITECH Act amended HIPAA by authorizing individuals for the first time to direct covered entities and their business associates to deliver PHI from certain electronic records (known as "Electronic Health Records" or "EHRs") directly to an identified third party in electronic form, without requiring the third party to first obtain and present a separate patient authorization to the covered entity or its business associate.  This is known as the "Third Party Directive." HITECH did not, however, apply the Patient Rate to such Third Party Directives. Given that HITECH limited the Third Party Directive to EHR's, and given the universal understanding that HITECH did not in any event apply the Patient Rate to such Third Party Directives, CIOX received relatively few Third Party Directives after passage of the HITECH Act.  Instead, most PHI requests by or on behalf of third parties continued to come via patient authorization—not the new Third Party Directive—and CIOX therefore continued to invoice such requests at the above-mentioned state-authorized rates.

13.     HHS implemented the HITECH Act's new Third Party Directive by amending the Privacy Rule in 2013.  Despite acknowledging that HITECH's terms were limited to EHRs and electronic-format delivery, HHS's new rules extended the Third Party Directive to any and all records maintained by a covered entity (not just EHRs) and authorized patients to direct the delivery of such records in any form or format (not just electronic form).  Even so, HHS's new regulations did not alter the

7

Privacy Rule's longstanding and consistently maintained directive that the Patient Rate applies only to the delivery of PHI directly to the requesting individual—not to cases where a patient's PHI is destined for a third party. As a result, while CIOX experienced a modest increase in Third Party Directives after HHS's 2013 rules were promulgated, most PHI requests by or on behalf of third parties continued to come via patient authorization—not the new Third Party Directive—and CIOX therefore continued to invoice such requests at the above-mentioned state-authorized rates.

14. That changed dramatically in 2016, when HHS's "2016 Mandates" for the first time required that the Patient Rate must now be applied to Third Party Directives. Since the issuance of those new regulations, there has been marked shift in the overall "mix" between patient authorizations and Third Party Directives that CIOX processes, and the conversion rate from patient-authorized requests to Third Party Directives appears to be accelerating.

15. Although the 2016 Mandates purported to give covered entities and their business associates three options for calculating the Patient Rate when fulfilling a given records request to which that rate applies—an "actual costs" option, an "average costs" option, and a $6.50 "flat fee" option—only the $6.50 flat fee option is practicable for entities like CIOX. And indeed, some of CIOX's covered-entity clients now expressly bar CIOX from charging more than $6.50 for fulfilling a Third Party Directive because they recognize the impracticality of the "actual costs" and "average costs" models set forth in the 2016 Mandates and have informed CIOX that, for that reason, they fear both federal enforcement action and potential liability if CIOX

charges more than $6.50 when fulfilling such Third Party Directives. Other covered entities with whom Ciox contracts likewise have imposed new contract terms that, more generally, require CIOX to comply with the 2016 Mandates.

16. The difference between the state-authorized rates CIOX previously was allowed to charge for delivering PHI to third parties and the $6.50 rate set forth in the 2016 Mandates is significant. Indeed, in many cases, that difference is several hundred dollars, and in others, it exceeds one thousand dollars per record request. *Supra* ¶ 11. At present, the conversion from patient-authorized requests (which are not subject to the Patient Rate) to Third Party Directives (which, by virtue of the 2016 Mandates and the response of CIOX's covered-entity clients to those Mandates, are subject to the Patient Rate) is costing CIOX well over $10 million per year that, absent the 2016 Mandates, CIOX previously could have charged in accordance with the above-mentioned state-authorized or independently-contracted rates. And given the apparent acceleration in the conversion rate, *supra* at 14, the cost of the 2016 Mandates is likely to continue growing.

17. If this Court were to bar HHS from enforcing the 2016 Mandates and/or the portions of HHS's 2013 amendments to the Privacy Rule that require CIOX to fulfill Third Party Directives seeking PHI that is not contained in an EHR and to deliver such PHI in any form or format, CIOX would revert to charging the state-authorized rates or independently-contracted rates it always has charged for delivering PHI to third parties pursuant to the patient-authorization process. The great majority of contracts CIOX has in place with its covered-entity clients would not prevent CIOX

from reverting to the higher rates, and the contracts which were amended after the 2016 Mandates to bar CIOX from charging more than $6.50 for fulfilling a Third Party Directive could, and I am confident would, be amended to permit CIOX to resume charging state-authorized or independently-contracted rates for fulfilling such requests.

18. Finally, I understand that because the defendants in this case are a federal official and a federal agency, monetary damages will not be available to compensate CIOX for the substantial losses it is suffering and will continue to suffer if HHS's challenged regulations are not enjoined.

Dated: May 2, 2018

_____
Tarun Kabaria

31568399 v1